UNPUBLISHED OPINION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| Jose L. RIVERA, | |
| Plaintiff, | Civil No. 17-1593 (RBK) |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon the appeal of Plaintiff Jose L. Rivera for review of the final decision of the Commissioner of Social Security. (Doc. No. 1.) The Commissioner denied Plaintiff's application for Social Security Disability Insurance Benefits, finding Plaintiff was not disabled as defined by the Social Security Act. As explained below, the decision of the Commissioner is **AFFIRMED**.

## I. THE FACTS

### A. Plaintiff's History

We begin by recounting the relevant history of Plaintiff Jose L. Rivera. Born in 1968, Plaintiff never obtained an education beyond the eighth grade, and never obtained a GED. (R. 493.) At approximately the time of the decision that we review today, Plaintiff was living at his niece's home (R. 130), where he did "a little laundry," never cooked meals, and babysat, but mostly did, in his own words, "nothing." (R. 133.) Plaintiff has stated he enjoys reading the paper. (R. 497.)

1

Plaintiff has worked as a janitor, factory worker, post care maker, machine operator, and gas station attendant in the past. (R. 38, 489.) The ALJ found that claimant has not engaged in substantial gainful activity since 2008. (R. 25.)

Plaintiff has some serious medical problems. He has a loss of vision in his right eye due to a childhood injury and reportedly experiences headaches and dizziness when he looks or focuses. (R. 29.) Plaintiff is obese, has a history of drug abuse, and suffers from hepatitis C and septic arthritis. (R. 25.) Although there are gaps in Plaintiff's treatment record, Plaintiff received methadone treatment until at least July 2015. (R. 112, 620.) Notes also reveal that Plaintiff used heroin in June 2012 and March 2014. (R. 944, 948.)

Plaintiff has also had cardiovascular health problems in the recent past. In 2008, he was hospitalized for lower extremity pain and swelling. (R. 642.) Testing revealed severe mitral regurgitations with vegetation, and an abscess on the mitral valve. (R. 642.) Plaintiff was treated for his endocarditis and underwent surgery. (R. 642-43.) At least one doctor has noted that Plaintiff's endocarditis was "probably secondary to a contaminated needle." (R. 102.) A September 2009 examination with Thierry Momplaisir, M.D., revealed normal examination findings, including normal extremities, pulmonary sounds, and blood pressure, as well as a regular heartbeat. (R. 609.) Dr. Momplaisir recorded similar findings in December 2008. (R. 606.) In 2009, state agency physician Joseph Michel, M.D., reviewing Plaintiff's prior application for social security benefits, noted that Plaintiff could occasionally lift twenty pounds; frequently lift ten pounds; sit for six hours in an eight-hour day; stand or walk for six hours in an eight-hour day; push and pull on an unlimited basis; and occasionally perform postural activities; and should "avoid concentrated exposure" to "hazards." (R. 613-16.)

In August 2009, a psychologist, Dr. Lewis Lazarus, diagnosed Plaintiff as having a learning disorder "not otherwise specified." (R. 622.) Dr. Lazarus also estimated that Plaintiff "functioned at best within the borderline range" of intelligence, "with a limited and well below average general fund of knowledge." (R. 621.) He also found that Plaintiff's memory skills were compromised with respect to recent memory and new learning, and that Plaintiff's attention and concentration were "marked by difficulties with persistence." (R. 621.) Plaintiff "was able to perform counting and simple calculations, but was very poor in doing Serial 3s." (R. 621.) Plaintiff was also "able to correctly repeat six digits in the same order of presentation" but "only three digits in the reverse condition consistently and correctly." (R. 621.) Dr. Lazarus also observed that Plaintiff had a depressed and apathetic affect, full orientation, fair insight and judgment, and demonstrated appropriate eye contact, fluent and clear speech, and coherent and goal-oriented thought processes. (R. 621.) Dr. Lazarus diagnosed a depressive disorder, and, after learning about Plaintiff's extensive history of substance abuse, also diagnosed polysubstance abuse in sustained full remission. (R. 621.) In response to these, Dr. Lazarus recommended vocational assessment and rehabilitation for Plaintiff's physical condition as well as for his cognitive and learning limitations. (R. 622.) Dr. Lazarus believed that Plaintiff was "capable of effectively managing funds at this time" but "some supervision is recommended in light of his questionable reasoning and judgment as well as suspected limited level of intellectual functioning." (R. 622.)

In September 2009, a non-examining state agency psychiatrist, Dr. Nenuca Bustos, determined that Plaintiff had a mild restriction of his activities of daily living; mild difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no episodes of deterioration or decompensation of extended duration. (R. 633.) The psychiatrist stated that a residual functional capacity assessment was necessary. (R. 623.)

3

In January 2010, Plaintiff was hospitalized for sudden shortness of breath. (R. 698.) He tested positive for influenza A and was treated with Tamiflu, as well as other medications. (R. 695-98.) Diagnoses notes indicated he had hepatitis C as well. (R. 736.) On separate occasions that year, Plaintiff received emergency treatment for bacterial pneumonia and also treatment for chest pain. (R. 882-83.)

In December 2011, treatment notes revealed that Plaintiff was snorting heroin after he had run out of a drug, Coumadin, prescribed to him for his heart. (R. 809.) In January 2012, treatment notes indicate that Plaintiff complained that the mother of his three children was frequently sick, "so the 'burden' of the kids is always on him." (R. 808.)

On March 9, 2013, Rosemarie Bialecki, D.O., attending to Plaintiff when he was completing disability paperwork, noted that Plaintiff was non-compliant with his Coumadin treatment and advised him to go to the hospital for blood testing, which Plaintiff declined. (R. 1005.) Plaintiff sought hospital treatment six days later because he had not taken Coumadin in months. (R. 818.) He was admitted, and an echocardiogram revealed minor pulmonary hypertension. (R. 972.) Later that year, Plaintiff also sought treatment for cellulitis on his lower extremities. (R. 907.)

In July 2014, Plaintiff sought emergency treatment for a rash that developed after he chased a soccer ball, apparently concerned for his heart. (R. 967.) In November 2014, Ken Klausman, M.D., examined Plaintiff. He noted Plaintiff walked with a moderate limp and had no far vision in his right eye, but did not make any other remarkable physical findings. (R. 857.) As for neurological issues, Dr. Klausman diagnosed right eye blindness, obesity, back pain, right ankle arthropathy, depression, hepatitis C, and status-post heart valve replacement. (R. 858.) He opined that Plaintiff could continuously lift up to fifty pounds and continuously carry up to ten pounds;

sit for five hours without interruption; stand for thirty minutes without interruption; walk for thirty minutes without interruption; sit for a total of eight hours in an eight-hour day; stand for a total of one hour in an eight-hour day; walk for a total of one hour in an eight-hour day; continuously reach in all directions, handle, finger, feel, push, and pull with both hands; never use his right foot to operate foot controls; continuously use his left foot to operate foot controls; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; frequently balance, kneel, stoop, crouch, and crawl; never read fine print; have occasional exposure to unprotected heights and moving mechanical parts; continuously operate a motor vehicle; have continuous exposure to humidity, wetness, dust, odors, pulmonary irritants, fumes, extreme cold, and vibrations; have frequent exposure to loud conditions; and he could shop; travel without a companion; walk without a wheelchair, walker, two canes, or crutches; walk a block at a reasonable pace on rough or uneven surfaces; use public transportation; climb a few steps with a single hand rail; prepare simple meals and feed himself; care for his personal hygiene; and sort, handle, and use paper and files. (R. 865.)

In January 2015, Jay Rubenstone, D.O., examined Plaintiff due to complaints of shortness of breath. (R. 974-79.) Dr. Rubenstone recorded normal examination findings and referred Plaintiff for an electrocardiogram, further recommending that Plaintiff continue Coumadin therapy, lose weight, and stop smoking. (R. 975, 978.) The electrocardiogram results revealed a mildly dilated atrium but were otherwise normal. (R. 982-84.) January 2015 treatment notes from East Camden Medical Center reveal that Plaintiff was not complaint with his Coumadin treatment. (R. 986.) A transthoracic echocardiogram revealed borderline left ventricular hypertrophy and mild tricuspid regurgitation, but was otherwise normal. (R. 1035.)

In February 2015, Richard W. Cohen, M.D., opined that Plaintiff had a mild restriction of his activities of daily living; mild difficulties maintain social functioning; moderate difficulties

maintaining concentration, persistence, or pace; and no episodes of deterioration or decompensation of extended duration. (R. 108-09.)

In March 2015, an agency physician, Dr. Alexander Hoffman, examined Plaintiff. (R. 1012.) He observed that Plaintiff appeared disheveled and spoke with slurred speech. (R. 1012.) Dr. Hoffman opined that Plaintiff could occasionally lift and carry up to ten pounds; sit for up to five hours in an eight-hour day; stand for two hours in an eight-hour day; walk up to two hours in an eight-hour day; occasionally use both hands for reaching in all directions, fingering, feeling, handling, pushing, and pulling; occasionally operate foot controls with both feet; never climb ladders or scaffolds, but occasionally perform all other postural activities; have occasional exposure to mechanical parts and no exposure to unprotected heights, dusts, fumes, pulmonary irritants, extreme cold, and vibrations; have moderate exposure to noise; and he could shop; travel without a companion; walk without an assistive device; walk at a reasonable pace on rough or uneven surfaces; use public transportation; climb without a handrail; prepare a meal and feed himself; care for his hygiene, and sort, handle, and use paper and files. (R. 1014-20.)

In July 2015, Dr. Rubenstone recorded normal examination findings and counseled Plaintiff to lose weight and stop smoking tobacco. (R. 1040.) August 2015 treatment notes also revealed an audible mid-systolic click, but otherwise normal findings. (R. 1066.)

### B. Procedural History

Plaintiff first filed in 2008 for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act 42 U.S.C. §§ 1382, 1382c. (Pl. Br. at 1.) Plaintiff's applications were initially denied in January 2009 and again on reconsideration in October 2009. (*Id.*)

6

Plaintiff reapplied for DIB and SSI in April 2011, stating that he had been disabled since June 17, 2008. (R. 369, 376.) After being denied initially and on reconsideration, Plaintiff requested a *de novo* hearing with an Administrative Law Judge. (R. 227-40.) On February 26, Plaintiff appeared before ALJ Joseph M. Hillegas. (R. 122-24.) ALJ Hillegas found that Plaintiff was not disabled at step five of the Social Security Administration's sequential disability analysis. *See* 20 C.F.R. § 303.1520(g). (R. 195-96.) On September 19, 2014, the Appeals Council granted Plaintiff's request for review of ALJ Hillegas's decision and remanded for readjudication. (R. 202-04.)

On February 25, 2015, Plaintiff appeared with counsel and testified at a new hearing held before ALJ Jonathon L. Wesner (henceforth "the ALJ"). (R. 102-04.) Richard Cohen, M.D., testified as a medical expert. (R. 102-04, 107-11.) To further flesh out an undeveloped record, the ALJ requested, and obtained in March 2015, the report of consultative examiner Alexander Hoffman, M.D. (R. 1012.) Plaintiff sought a supplemental hearing to address the vocational issues raised by Dr. Hoffman's report. (R. 533.) On August 15, 2015, Plaintiff appeared again with counsel and testified at a supplemental hearing. (R. 48-50.) In addition, a vocational expert, Louis Szollosy, also testified. (R. 48-50, 81-91, 93-100.)

**C. The September 9, 2015 Decision**

In consideration of Plaintiff's history, the ALJ found that Plaintiff was not disabled on September 9, 2015. (R. 25-39.) The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since his June 17, 2008 alleged onset date, and had thereby satisfied step one of the disability analysis. *See* 20 C.F.R. § 404.1520(b). (R. 25.) The ALJ next found that Plaintiff had satisfied step two and had the following "severe" impairments: endocarditis, heart valve replacement, depression, polysubstance abuse, hepatitis C, septic arthritis of the lower

extremity, obesity, and limited vision in his right eye. (R. 25.) Proceeding to step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of a Listed impairment. *See* 20 C.F.R. § 4040.1520(d). (R. 26.)

The ALJ then made a residual functional capacity ("RFC") assessment to determine the most that Plaintiff could do despite the limiting effects of his impairments. § 404.1545. (R. 29.) According to the ALJ, Plaintiff could

> lift and/or carry less than 10 pounds occasionally; sit for five hours total in an eight-hour workday; stand for two hours total in an eight-hour workday; walk for two hours total in an eight-hour workday; occasionally use his bilateral upper extremities to reach, handle, finger, feel, and push and/or pull; occasionally operate foot controls with his bilateral lower extremities; occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; never climb ladders or scaffolds; occasionally tolerate exposure to moving mechanical parts, humidity and wetness, dusts, odors, fumes, and pulmonary irritants, extreme cold, vibrations, and never tolerate exposure to unprotected heights and operating a motor vehicle. He can meet the mental demands associated with unskilled work but is precluded from meeting the increased mental demand associated with semi-skilled and skilled work. Additionally, he cannot perform tasks involving depth perception or binocular vision.

(R. 29.) The ALJ reached this formulation of RFC by interpreting the expansive medical record outlined above.

At step four, the ALJ determined that Plaintiff could not perform any past relevant work. (R. 38.) The ALJ also noted that at the time of the alleged disability onset, Plaintiff was 40 years old, defined as a "younger individual" under 20 C.F.R. §§ 404.1563 and 416.964. (R. 38.)

At step five, the ALJ noted that if Plaintiff had the RFC to perform the full range of light work, a finding of "not disabled" would by directed by Medical Vocational Rule 202.17. (R. 39.) However, the ALJ found that the Plaintiff was subject to additional limitations, and instead the ALJ relied on the vocational expert's opinion. (R. 39.) The ALJ asked the vocational expert, "after considering the record as a whole," to assume a hypothetical individual with Plaintiff's vocational

characteristics who could perform light work; sit for five hours in an eight-hour day; stand for two hours in an eight-hour day; walk for two hours in an eight-hour day; never climb ladders or scaffolding but occasionally perform other postural activities; occasionally reach, handle, finger, feel, push and pull with the upper extremities; must avoid hazards; and who could not perform activities requiring far acuity or depth perception. (R. 81-98.) The vocational expert testified that he believed the hypothetical individual would be capable of performing the representative occupations of surveillance monitor and call-out operator. (R. 86.) On reliance on the testimony, the ALJ concluded, given Plaintiff's age, education, work experience, and RFC, Plaintiff would be able to perform the requirements of representative occupations, "such as a surveillance systems monitor" or a "call-out operator," unskilled jobs with a sedentary exertional level existing in numbers of 90,000 and 20,000 nationally, respectively. (R. 39.) Consequently, the ALJ found that Plaintiff, considering his particular situation, was capable of making a successful adjustment to other work that exists in significant numbers in the national economy and was, therefore, "not disabled." (R. 39.)

Unsatisfied with this outcome, Plaintiff filed this action pursuant to 42 U.S.C. § 405(g). We review.

## II. STANDARD OF REVIEW

When reviewing the Commissioner's final decision, this Court is limited to determining whether the decision was supported by substantial evidence, after reviewing the administrative record as a whole. *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *See,*

*e.g., Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Courts may not set aside the Commissioner's decision if it is supported by substantial evidence, even if this court "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

When reviewing a matter of this type, this Court must be wary of treating the determination of substantial evidence as a "self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). This Court must set aside the Commissioner's decision if it did not take into account the entire record or failed to resolve an evidentiary conflict. *See Schonewolf v. Callahan*, 927 F. Supp. 277, 284–85 (D.N.J. 1997) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)). Evidence is not substantial if "it really constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114). A district court's review of a final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." *Kent*, 710 F.2d at 114.

## III. DISCUSSION

Plaintiff challenges the Commissioner's determination under two major headings. First, he argues that the ALJ posed an improper hypothetical question to the vocational expert. Second, Plaintiff argues that the ALJ lacked substantial evidence to conclude that Plaintiff could work as a surveillance system monitor or call-out operator. Plaintiff argues that those positions, as defined by the standards relied on by the vocational expert, are beyond his abilities.

### D. The ALJ's Hypothetical Question Is Not Reversible Error

Plaintiff argues that when the ALJ posed the hypothetical question to the vocational expert, asking whether a hypothetical individual could perform light work consistent with his RFC, the

ALJ neglected to ask whether that individual could "occasionally tolerate exposure to . . . dusts, odors, fumes, and pulmonary irritants." (R. 81.) Plaintiff appears to argue that this omission, which is in the RFC but not in the line of questioning asked of the vocational expert, invalidates the ALJ's reliance on the vocational expert's testimony. Because the words "dust," "odors," "fumes," and "pulmonary irritants" do not appear in the hearing transcript of the vocational expert's testimony, Plaintiff argues that the Commissioner failed to carry its burden of production and remand is warranted.

"A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). The ALJ did not ask about the risk of airborne irritants. However, the occupations identified by the vocational expert—surveillance system monitor or call-out operator—do not, as defined by the *Selected Characteristics of Occupations*, a companion to the *Dictionary of Occupational Titles* used by the Social Security Administration,[1] involve exposure to these risks. Thus even if the ALJ had asked about these risks, it would have made no difference to the analysis. Because an error is harmless where the ALJ "would have reached the same conclusion notwithstanding his initial error," *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994), we find the ALJ's question, even if insufficient, did not give rise to an error and the ALJ appropriately relied on the vocational expert's testimony to reach his conclusion.

---

[1] *See* SCODICOT 04.02.03 (surveillance system monitor); SCODICOT 237 (call-out operator).

**E. Substantial Evidence Supports the ALJ's Finding that Plaintiff Could Perform Work as Either a Surveillance System Monitor or as a Call-Out Operator**

Plaintiff objects to the ALJ's finding that he could perform the various skill levels required for work as a surveillance system monitor or call-out operator. Per the Dictionary of Occupation Titles, both occupations require "Language: Level 3":

> Language: Level 3 - READING: Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.

DICOT 237.367-014; DICOT 379.367-010.

Both positions also require "Reasoning: Level 3":

> Reasoning: Level 3 - Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

DICOT 237.367-014; DICOT 379.367-010.

In addition, being a call-out operator requires "Math: Level 2":

> Math: Level 2 - Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.

DICOT 237.367-014.

We find the ALJ had substantial evidence to support his conclusion that Plaintiff could perform these occupations. The ALJ considered the entire record, and the record indicates, among many other things, that Plaintiff liked to read the newspaper. (R. 497.) Although Plaintiff objects and argues his own disability filings are riddled with spelling and typographical errors, the Court observes that, even assuming Plaintiff is as inarticulate as he makes himself out to be, an inability to write well does not suggest a complete inability to "read a variety of novels, magazines, atlases,

12

and encyclopedias." Furthermore, the job description for a surveillance system monitor is exactly what it sounds like—someone who surveils systems, most likely at a desk, watching a screen—and is notably bereft of any explicit reference to reading ability. *See* DICOT 379.367-010. We find the ALJ had substantial evidence to conclude Plaintiff could perform this position as to his reading ability; by extension, we also find the ALJ had substantial evidence to conclude Plaintiff could do the reasoning required of those positions, i.e., "apply commonsense understanding to carry out instructions."

With respect to the call-out operator occupation, Plaintiff argues he lacks the rudimentary math skills necessary to perform this position, and that the ALJ lacked substantial evidence to find otherwise. Once again, we disagree. For one, the vocational expert opined Plaintiff was able to perform this position. For another, the record before the ALJ has ample evidence which the ALJ could have interpreted, and did interpret, as showing Plaintiff was at least capable of performing this. Although Plaintiff argues Dr. Lazarus's clinical finding showed Plaintiff was very poor at doing Serial 3s and was subject to some intellectual impairments, the ALJ relied on other findings, such as those by Drs. Bustos and Klausman, that were inconsistent with Dr. Lazarus's finding. He also reviewed Plaintiff's statements that he could perform daily activities of living, such as babysitting or watching television, which indicate a basic level of functioning. The ALJ is not obliged to apply the reasoning of any particular examining doctor in the face of inconsistent evidence. We therefore find he had substantial evidence to support his determination.

## IV. CONCLUSION

The Commissioner's decision is **AFFIRMED**. An order follows.


Dated: March 22, 2018                         /s Robert B. Kugler
                                              ROBERT B. KUGLER
                                              United States District Judge